IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2026

## STATE OF TENNESSEE v. HUNTER JAY CHANTLER

**Appeal from the Circuit Court for Henry County**
No. 17064    Bruce I. Griffey, Judge

_____

### No. W2025-00977-CCA-R3-CD

_____

The Defendant, Hunter Jay Chantler, appeals from his jury conviction for aggravated sexual battery and resulting eight-year sentence. On appeal, the Defendant asserts that (1) the evidence introduced at trial was insufficient to support his conviction due to the victim's lack of credibility and (2) the trial court abused its discretion by questioning the minor victim during the State's direct examination at trial. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Steven L. West, Huntingdon, Tennessee (on appeal), and David A. Walker, Paris, Tennessee (at trial), for the appellant, Hunter Jay Chantler.

Jonathan Skrmetti, Attorney General and Reporter; Julia A. Johnson, Assistant Attorney General; Neil Thompson, District Attorney General; and C. Morgan Crocker and Anthony L. Clark, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

#### I.    FACTUAL AND PROCEDURAL HISTORY

This case arises from the alleged sexual abuse of the four-year-old victim by the twenty-three-year Defendant on December 2, 2023, while the victim was spending the night at her grandparents' house. The victim's aunt, Tori Dickson, and Ms. Dickson's

boyfriend, the Defendant, also lived at the house, and the victim shared a bedroom with the two of them whenever she spent the night. After the victim's subsequent disclosure that the Defendant had touched her "private parts" during this December 2 overnight visit, the victim's mother contacted law enforcement. Thereafter, the victim underwent a forensic interview, wherein she also made a disclosure that the Defendant had sexually abused her. A Henry County grand jury indicted the Defendant on July 1, 2024, for this alleged conduct, charging him with aggravated rape of a child in count one and aggravated assault in count two. *See* Tenn. Code Ann. §§ 39-13-102, -531. By agreement of the parties, the offenses were severed, and the Defendant proceeded to a two-day jury trial, as to count one only, on January 8, 2025.[1]

Prior to the parties' opening statements, the trial court issued preliminary instructions to the jury. As relevant to the issues presented by this appeal, the trial court instructed as follows: "During the course of the trial, I may ask a question or two of a witness. If I do, that does not indicate that I have any opinion about the facts in this case or that I have any opinion with respect to that witness' credibility."

After opening statements were completed, the State called the victim to the stand, and she was placed under oath. She provided her birthday and indicated that she was five years old and in kindergarten at the time. The victim identified the Defendant in court by his first name. When asked who the Defendant was to her, how she knew him, or why she was present in court, the victim responded, "I forgot." However, the victim knew that she regularly spent the night at her grandparents' house when she was around four years old, and she recalled that she had often seen the Defendant there. She confirmed that, at that time, she had slept in her own bed in a bedroom which she shared with the Defendant and her aunt, Ms. Dickson. According to the victim, she played games and, at first, had fun with the couple.

The victim then agreed that, at present, she no longer saw the Defendant or Ms. Dickson. While the victim indicated that she knew the reason for this state of affairs with an affirmative head nod, she said "I forgot" when asked to verbalize her answer. When asked if the Defendant had "ever made [her] feel uncomfortable[,]" the victim nodded her head and gave a verbal affirmative response. However, she replied "I forgot" when asked what he had done to make her feel that way. She then recalled one occasion when she was jumping back and forth between the two beds in the bedroom while the Defendant was

---

[1] The Defendant later entered a plea of guilty in count two to the lesser included offense of assault, a Class A misdemeanor. *See* Tenn. Code Ann. § 39-13-101. He does not challenge this conviction on appeal.

- 2 -

lying on the bed by himself and Ms. Dickson was in the kitchen "[c]ooking." Nonetheless, the victim testified that nothing "uncomfortable" happened during this encounter.

The victim was asked to describe her "private parts" and what they were used for, but she was unable to provide any details, stating only, "I forgot." She then affirmed that she was feeling "[g]ood" and was not "nervous at all[.]" When asked if she had ever told anyone that "something" had happened to her, she first replied, "I forgot," and later nodded in a negative manner. At this point in the State's direct examination of the victim, the prosecutor asked the trial court for "one second." Thereafter, trial court proceeded to engage the victim with questions:

> THE COURT: You know you have different parts of your body?
>
> THE WITNESS: Yes.
>
> THE COURT: Um, and part—both girls—you know the difference between boys and girls, right?
>
> THE WITNESS: Yes.
>
> THE COURT: And part of what—we use part of our body to go to the bathroom, right?
>
> THE WITNESS: Yes.
>
> THE COURT: Is that private parts?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay.
>
> General, why don't you try a little further?
>
> [THE PROSECUTOR]: Okay.

The prosecutor returned to questioning the victim and inquired if "anyone [had] ever touched [her] private parts[,]" which prompted a verbal affirmative response from the victim. The victim was next asked about who the party responsible for this behavior was, leading to the following dialogue:

Q. . . . And who would that person be?

A. I forgot.

Q. You forgot. Is that person here today?

A. Yes.

Q. Okay. And who's that? Can you—if you forgot, can you either— if you remember his name, tell me—point him or her out. Who . . . did it? You said they're in here . . . who touched your private parts?

A. I forgot.

Q. Can you see that person?

A. (Nodding affirmatively.)

Q. Do you want to point at them? Was it me?

A. Him.

The trial court then noted, "The record will reflect . . . she pointed in the direction of the Defendant."

The prosecutor continued with questioning of the victim: "And . . . when [the Defendant] touched your private parts, how did he do that? What did he use?" The victim said that the Defendant used "[h]is finger[,]" though she could not recall what he did with his finger. She was able to explain that the Defendant had "touch[ed] it" on the "[i]nside" and that this felt "[w]eird." But the victim responded "I forgot" when she was asked, "Did he do anything with his finger when it was in there?" She likewise could not recall why the Defendant stopped or the events that took place afterward. However, the victim affirmed that this happened while Ms. Dickson was cooking and her grandparents were in their bedroom, and she recalled later talking about the events with her mother. The victim agreed that she had never seen the Defendant again since that time, which made her feel "[h]appy."

When the prosecutor again asked the trial court for "one second," the trial court once more began to question the victim:

THE COURT: Let me ask you, . . . when you were touched and [it] made you feel uncomfortable, did you have clothes on or clothes off?

THE WITNESS: Clothes on.

THE COURT: On.

Were you touched on the outside of the clothes or un—underneath your clothes?

THE WITNESS: In. Inside.

THE COURT: Okay. Underneath your clothes, touched your skin?

THE WITNESS: (Nodding affirmatively.)

THE COURT: Was it the front part where you pee-pee, or the back part where you go poo-poo?

THE WITNESS: Pee.

THE COURT: Pee-pee. Okay.

The prosecutor then stated that she had no additional questions for the victim.

Thereafter, the trial court asked the parties to approach for a bench conference, during which it inquired whether defense counsel wanted to "express an objection" regarding the court's "questioning" of the victim. Defense counsel noted an objection for the record, and the trial court noted that its questioning was based on a belief that "some people can just get better rapport with children," that it had experience with children, and that it "just fe[lt] like trying to get through [the victim's] testimony." Trial resumed with cross-examination of the victim, during which she confirmed that she was telling the truth, no one had told her what to say in her testimony, and no one else had "ever done something like that" to her.

Ms. Dickson was next to testify. She and the Defendant dated for approximately three years. She described the Defendant "as nurturing" and "a caretaker" and as someone who "enjoy[ed] playing with kids." Ms. Dickson confirmed that, at the time of the alleged incident, she and the Defendant had lived at the residence "full-time[,]" and they had shared

a bedroom with the victim whenever the victim visited the residence, which was "[p]retty regularly" on the weekends. Ms. Dickson explained that the victim had her own bed separate from the one Ms. Dickson shared with the Defendant. Ms. Dickson considered the victim her responsibility during these visits, so Ms. Dickson "made sure that[ the victim was] okay, and stuff like that." According to Ms. Dickson, she and the victim often played together, watched television, or went outside.

The victim was on a "regular schedule," but the Defendant worked the "third shift" at Walmart. Ms. Dickson explained that the Defendant typically had returned home around 7:00 a.m. in the morning, went to sleep after an hour or so of playing video games, and woke up between 6 or 7:00 p.m. at night. Ms. Dickson indicated that her schedule had mirrored the Defendant's, that she was plagued by sleeping difficulties, and that she was up during most of the night, "[p]retty much every night." They maintained this schedule even on the weekends.

When Ms. Dickson and the Defendant were awake throughout the night, they would typically stay in their bedroom where the Defendant would play video games while Ms. Dickson used her cell phone. Ms. Dickson denied there was ever a time when she and the victim were both asleep while the Defendant was awake playing video games. Ms. Dickson averred that she had never left the victim alone in the bedroom with the Defendant unless she went to the bathroom, but she clarified that if the victim was awake, the victim generally accompanied her to the bathroom. Ms. Dickson refuted the possibility of her dozing off "here or there" throughout the night while the victim was at the house.

On cross-examination, Ms. Dickson testified that the victim had arrived at her grandparents' house on Friday, December 1, 2023, around "[n]oon-ish" while the Defendant slept. Following the victim's arrival, Ms. Dickson and the victim sat in the living room where they played and watched television. After the Defendant awoke sometime between 6 and 7:00 p.m. that evening, Ms. Dickson and the victim went into their shared bedroom where the Defendant was playing a video game. According to Ms. Dickson, the victim fell asleep in the victim's bed around 9 or 10:00 p.m. while the Defendant continued playing a video game, and she used her phone in the shared bed. Ms. Dickson recalled having gone to the bathroom at one point during the evening while the victim was sleeping, estimating that she was gone from the room for "[f]ive minutes . . . at the most." When Ms. Dickson left the bedroom, as well as when she returned, she observed the Defendant sitting in the recliner at the end of their bed playing a video game and the victim asleep in her own bed.

The following morning, Ms. Dickson got up with the victim around 6 or 7:00 a.m., at which time the Defendant was still awake and playing a video game. Ms. Dickson took the victim out of the bedroom with her while she made breakfast, and after all three of them had eaten, the Defendant went to sleep alone in the bedroom. Ms. Dickson stayed in the living room, and the victim went to visit her grandparents in their bedroom. The victim left the residence shortly after noon that Saturday. She never witnessed the Defendant touching the victim inappropriately at any time during the visit, and she never saw any evidence of the Defendant's having a sexual predilection towards small children.

On redirect, Ms. Dickson stated that it was impossible for the victim to have gone unnoticed into the bedroom where the Defendant was sleeping that day because Ms. Dickson could see and hear down the hallway. According to Ms. Dickson, the victim was supposed to stay out of the bedroom whenever the Defendant was sleeping so as to not wake him up. Ms. Dickson agreed that, while the victim listened to this instruction "[f]or the most part," the victim's belongings were also in that bedroom. And although the victim had on more than one occasion played in the bedroom while the Defendant was sleeping by jumping back and forth between the beds, Ms. Dickson was "[p]retty much always" present when this occurred. Ms. Dickson insisted that she was awake and alert the entire time the victim was visiting on this December 2 occasion, despite it being an almost twenty-four-hour period.

The victim's mother confirmed that, around December 2023, the victim was four years old and the victim frequently spent the night at her parents' (the victim's grandparents') home on the weekends. From her personal observations, she believed the victim liked the Defendant prior to this time. The victim's mother recalled that the victim initially had disclosed the abuse to the mother's "stylist," and the stylist had called her while she was at work. She "came home immediately and called law enforcement." According to the victim's mother, the victim was "pretty much" potty-trained prior to this time and was "a very social little girl." However, the victim had since become "scared to go anywhere," did not want to leave the house, and had regressed in her potty-training to the point that her issues with bladder control were causing her to develop urinary tract infections regularly. On cross-examination, while the victim's mother agreed that the victim had developed one or two urinary tract infections when she initially began potty-training, she clarified that they had not occurred regularly or often prior to this incident.

Investigator David Andrews with the Henry County Sheriff's Office confirmed that a report of sexual abuse had been received from the victim's mother on December 4, 2023, and that he was the lead investigator into the victim's allegations against the Defendant.

Following a referral to the Department of Children's Services ("DCS"), the victim made a disclosure of sexual abuse in the course of a forensic interview.[2]

Thereafter, Investigator Andrews interviewed the Defendant on December 20, 2023. During this interview, which was proceeded by an advisement of *Miranda*[3] rights, the Defendant provided his living arrangement, work routine, and sleep schedule while he lived at the victim's grandparents' house. The Defendant confirmed that the victim, who he referred to as "Muffin," often came to the residence for weekend visits with her aunt, also his girlfriend, Ms. Dickson. The Defendant described his relationship with the victim as "an uncle-niece type." He stated that, sometimes during these visits, he and the victim engaged in play-fighting and that he "would hit her," though "not hard, . . . just in a playing manner. . . . [N]ormal stuff that . . . an adult would do with a four-year-old." The Defendant also confirmed that the victim had been going through potty-training and wore pull-ups during this time. He told Investigator Andrews that he had never provided hygienic care for the victim, such as giving her a bath or changing her pull-ups. The Defendant initially insisted that he was "[n]ever in the bedroom alone" with the victim. Then, after Investigator Andrews continued to inquire whether the Defendant was ever alone with the victim, the Defendant recalled one incident when the victim came in the bedroom, and they were alone. According to the Defendant, the victim took off her shirt to change into another one, which made him "very uncomfortable" because she was "a growing kid," and he informed Ms. Dickson of the incident.

The Defendant indicated to Investigator Andrews that he had been informed by Ms. Dickson of the victim's allegations of inappropriate sexual touching, and he therefore knew why he was being interviewed. When Investigator Andrews asked the Defendant directly if he had ever touched the victim in such a manner, the Defendant responded, "Not in a sexual way. We would play-fight with her, but nothing sexual, never nothing sexual." Investigator Andrews explained to the Defendant that there were plausible reasons for the victim's disclosure, such as a bathroom, diaper, or medication incident, but that four-year-olds do not generally "have the knowledge base to construct" such allegations "when they're talking about their private parts" and that someone "touched" them and "it hurt." Nonetheless, the Defendant persisted that he could not have touched the victim inappropriately, even by accident during play-fighting: "No, never. I never even pick[ed] her up. She would jump on me in the bed when I was asleep to wake me up." However, the Defendant later agreed with Investigator Andrews that it was "possible" for accidental

---

[2] The victim's forensic interview was not admitted at trial and is not included in the record on appeal.

[3] *See Miranda v. Arizona*, 384 U.S. 436, 458, 479 (1966).

touching of the victim's private areas to have occurred during play-fighting, which was "the only thing" he could "think of." Following the interview, Investigator Andrews met with the prosecutor, and a charging decision was made.

On cross-examination, Investigator Andrews opined that "the forensic interviewer had a good rapport with" the victim during the interview. He was advised by DCS that the victim was "super-shy in the home" when they originally spoke with her, so he did not "push" speaking with the victim any further. Investigator Andrews acknowledged that there was no "other evidence" uncovered during his investigation besides the victim's disclosure during her forensic interview. He also agreed it was "possible that with [the victim's] age group, that something like the horseplaying or . . . the changing the diaper could be a possible explanation . . . for something like that happening." Thereafter, the State rested its case-in-chief.

The Defendant made a motion for judgment of acquittal. The trial court denied the motion, determining that the evidence was sufficient to proceed: "[T]he essential elements of the offense, uh, were established, uh, particularly from the minor child in this case, that . . . [the Defendant] . . . touched her, uh—uncomfortable and she later explained it was her front private parts."

Thereafter, Ms. Dickson was recalled as a defense witness. Ms. Dickson believed that the victim had several bladder infections prior to December 2, 2023. She explained that the victim "was always talking about being itchy and hurting" in her genital area, and the victim had developed three or four urinary tract infections during the six months prior to these allegations being made, which had required medication for the victim.

The Defendant's sister, Ruby Chantler, testified that the Defendant was "very caring" and "very good with kids." The Defendant had lived with her previously, and she never had any occasion to find him with "inappropriate" material as it pertained to "a minor child." She stated that she would trust the Defendant with her own child, including her ten-month-old son. On cross-examination, Ms. Chantler, despite her previous description of the Defendant as a caretaker, said that she was not aware of any reason why the Defendant would have been uncomfortable being alone with the victim prior to December 2, 2023.

The Defendant, who was twenty-four years old at the time of trial, testified in his own defense, recalling the overnight visit in question. He repeated his work and schedule, confirming that he was not working on the evening of December 1, 2023, because it was a Friday. According to the Defendant, he awoke around 6:00 p.m. that day, and the victim

was there. He went to speak with Ms. Dickson's mother in her bedroom and then returned to the bedroom he shared with the victim at roughly 6:30 or 7:00 p.m. The Defendant said that he played a video game all evening while lying in the recliner in the bedroom, until approximately 6:00 a.m. the following morning. He only took breaks to use the bathroom or get some food or drink. At first, the victim stayed in the living room with Ms. Dickson before they both came into the bedroom around 10 or 11:00 p.m. The victim eventually went to sleep in her own bed, during which time Ms. Dickson was in the room either using her phone or watching the Defendant play his video game. At one point in the evening, according to the Defendant, the victim "jumped off her bed and landed on" Ms. Dickson, the victim then got in bed with Ms. Dickson, and the victim eventually fell asleep again. He could not recall any trips by Ms. Dickson to use the bathroom during this time period, though he believed she must have made one.

The next morning the victim awoke around 6:00 a.m., and after having breakfast, the victim stayed in the kitchen with Ms. Dickson where they cleaned the dishes. The Defendant returned to the bedroom alone and briefly played a video game before going to sleep. When he awoke later that evening, the victim had returned to her own home. The Defendant denied his ever having touched the victim inappropriately. He said that, while he sometimes engaged in play-fighting with the victim, he never played with the victim in any way "that would be outside of the course of what would be considered acceptable."

On cross-examination, the Defendant agreed that it was "a possibility" he "may have hit the thigh or something like that" while play-fighting with the victim. He asserted that he was "good with kids in the sense" that he would "take care of them[,] . . . protect them, . . . nurture them[,] and stuff like that." According to the Defendant, he treated the victim the same as any other child "[f]or the most part[.]" However, if the victim ever needed anything while she was visiting, the Defendant would "immediately" get Ms. Dickson to provide whatever care the victim required because he "didn't feel [he] was responsible for watching somebody else's kid[.]"

Thereafter, the defense rested, and the Defendant renewed his motion for judgment of acquittal, which was denied. Following closing arguments, the trial court charged the jury. Included within those instructions, the trial court told the jury that they were "the exclusive judges of the facts in the case[,]" it was their "duty to decide how much weight to give the direct and circumstantial evidence[,]" and they were "the exclusive judges of the credibility of witnesses and the weight to be given their testimony." The jury then deliberated and found the Defendant guilty of the lesser included offense of aggravated sexual battery, a Class B felony. *See* Tenn. Code Ann. § 39-13-504. At a later sentencing hearing, the Defendant received a sentence of eight years' incarceration as a Range I,

standard offender, to be served at a one hundred percent service rate in the Tennessee Department of Correction.

The Defendant filed a timely motion for new trial, raising the same two issues he now brings on appeal. At the hearing on the motion for new trial, the trial court first found that the evidence was sufficient to support the Defendant's conviction for aggravated sexual battery. The trial court reasoned that assessment of the victim's credibility was within the jury's purview, and it noted that the jury found the Defendant guilty of a lesser included offense to the indicted charge of rape of a child. Regarding the Defendant's second issue concerning the trial court's questioning of the victim, the trial court observed that the five-year-old victim appeared "somewhat nervous" at trial and she was "having a little difficulty in responding." The trial court then found the issue to be without merit, explaining,

> Uh, the whole purpose of a trial is to seek the truth . . . for the purposes of justice—and, . . . the Court's questions . . . were not leading or intended to sway the witness in any manner, but simply an open inquiry as to what happened, who did it, if anybody or anything. And so, I'm not aware of any case authority that says the Court . . . is prohibited from asking those questions and, . . . I don't think the Court's questioning in this case was outside the bounds of appropriate determination . . . .
>
> . . . [T]he Court was simply trying to hear from the alleged victim themselves as to what they say occurred, and then it's up for the jury to make the determination whether to believe the testimony or not.

This timely appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant generally asserts that the evidence was insufficient to support the jury's verdict because the State failed to meet its burden of proof beyond a reasonable doubt. In presenting this argument, he notes the victim's multiple "I forgot" responses, the State's leading questions in an effort to elicit information, and Investigator Andrews' testimony "that it [was] not uncommon for young children to mistake horseplay or other innocuous contact as sexual contact." According to the Defendant, "[u]p until" the trial

court's questioning of the victim, which was at times leading, "the State did not obtain any testimony from the [victim] supporting [a] conviction of the Defendant."

The State responds by asserting that any objection to the leading nature of any questions is waived, the trial court's questioning of the victim was proper, and the Defendant's sufficiency argument is simply a credibility challenge, which is a matter solely within the jury's province. The Defendant, in a reply brief, contends that "the record contains at best equivocal statements and a cascade of non-responses insufficient to meet the State's burden." He reiterates that "the only detail suggesting sexual contact—under-clothing touching at the 'pee-pee' area—was secured by the judge, not spontaneously recounted by the [victim] or elicited by the State through non-leading methods."

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The 'human atmosphere of the trial and the totality of the evidence' before

the court below cannot be reproduced in an appellate court, which sees only
the written record[.]

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (quoting *Folk v. Folk*, 355 S.W.2d 634, 637 (Tenn. 1962)). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

Initially, we note that the Defendant, in making his sufficiency argument, challenges the answers received during the trial court's questioning of the victim, as well as noting their prejudicial nature. We address the propriety of the trial court's questioning of the victim below. Regardless, even if certain evidence was inadmissible, the sufficiency of the evidence "must be examined in light of *all* the evidence presented to the jury, including that which is improperly admitted." *State v. Long*, 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000) (emphasis added) (first citing *Lockhart v. Nelson*, 488 U.S. 33, 41-42 (1988); and then citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)). Moreover, we agree with the State that the Defendant has waived any potential challenge to the leading nature of certain questions by failing to raise such an objection in the trial court. *See* Tenn. R. Evid. 103(a)(1) (stating that an error may not be predicated on a ruling which admits evidence "unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context"); *State v. Reynolds*, 635 S.W.3d 893, 930 (Tenn. 2021) ("Tennessee law requires a timely and specific objection in the trial court to preserve an evidentiary issue for appellate review.").[4] Accordingly, any answers received from the victim through leading questions or the trial court's inquiry can all be properly considered by this court in performing a sufficiency analysis.

As relevant to this appeal, aggravated sexual battery includes "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). Sexual contact includes

---

[4] In his presenting both of his arguments in his appellate briefs, the Defendant frequently notes the leading nature of the questions posed to the victim by both the trial court and the State. However, even in his reply brief, the Defendant does not request plain error review of the leading nature of any particular questions posed to the victim. Instead, the Defendant vaguely responds to the State's waiver argument: "Efficiency cannot justify supplying the prosecution's missing proof. Nor does the absence of a contemporaneous objection to leading cure structural prejudice when the judge's own questioning is the source of the crucial evidence[.]" Accordingly, we decline to review any stand-alone error in regard to leading questions for plain error. *See State v. Morgan*, 727 S.W.3d 182, 198 (Tenn. Crim. App. 2025).

the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

*Id.* § -501(6).  Intimate parts include "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]"  *Id.* § -501(2).

Here, while the Defendant correctly notes that the victim gave multiple "I forgot" responses at trial, she also testified to the following.  The victim described the sleeping arrangements when she spent the night at her grandparents' house at the age of four.  She recalled that she slept in the same room with the Defendant and Ms. Dickson at that time, and they played games and had fun initially.  The victim confirmed that she no longer saw the Defendant, which made her "[h]appy" because he had "made [her] feel uncomfortable." The victim was able to identify her "private parts" as the part of one's body used "to go to the bathroom" and where one "pee[d]."  The victim provided a verbal affirmative response when asked if "anyone [had] ever touched [her] private parts" and then pointed to the Defendant in the courtroom as the responsible party.  She explained that the Defendant had "touch[ed] it" underneath her clothing with "[h]is finger," which felt "[w]eird."  The victim indicated that this incident happened while Ms. Dickson was cooking and her grandparents were in their bedroom.

Additionally, the victim recalled later talking about the events with her mother, and her mother confirmed the discussion.  The victim's mother further testified that, before December 1, 2023, the victim was a "very social little girl" but, afterwards, the victim became "scared to go anywhere."  The victim had also regressed in her "potty-training" in that she was no longer able to control her bladder.  The victim suffered from multiple urinary tract infections following this event, which were not common previously.  Ms. Dickson confirmed that, at one point during the December evening in question, she did take a bathroom break alone for about five minutes.  Investigator Andrews indicated that, during the victim's forensic interview, she made an allegation of inappropriate sexual touching at the hands of the Defendant that "hurt."  Investigator Andrews also explained that, while there were plausible explanations for the victim's allegations, four-year-olds do not generally "have the knowledge base to construct" such accusations.

The Defendant was described "as nurturing" and "a caretaker," and he averred that he treated the victim the same as any other child "[f]or the most part[.]" However, he stated that, if the victim ever needed anything while staying at the residence, he "immediately"

went to Ms. Dickson because he did not feel that that victim was his responsibility to care for. In a similar context, the Defendant's sister testified that she could not think of any reason why the Defendant would have been uncomfortable being alone with the victim prior to December 2, 2023, given his caring and nurturing nature.

The Defendant, during his interview with Investigator Andrews, also attempted to distance himself from the victim. He told Investigator Andrews that he never had provided the victim with any hygienic care and that they were "[n]ever in [their shared] bedroom alone" despite the abundant amount of time the victim stayed at her grandparents' house. The Defendant subsequently recalled one occasion where he was briefly alone with the victim in their shared bedroom when the victim came in to change her shirt. The victim's changing of her shirt in front the Defendant made him "very uncomfortable" because she was "a growing kid," to such an extent that he decided to inform Ms. Dickson of the incident. Eventually, the Defendant acknowledged, both at trial and during his interview with Investigator Andrews, that it was possible for an accidental touching to have occurred during one of his play-fights with the victim. Though, despite this possibility, the Defendant said to Investigator Andrews that he had "never even pick[ed] up" the victim during these times.

Ms. Dickson also, through her testimony, attempted to separate the victim from the Defendant and the potential time they spent alone together in the residence. Ms. Dickson indicated that she often had difficulty sleeping and that the victim was most always supervised by her while in the residence. Ms. Dickson denied there was ever a time when she and the victim were both asleep while the Defendant was awake playing video games, and she refuted the possibility of her ever dozing off "here or there." In addition, Ms. Dickson said that she had stayed awake for twenty-fours over the night in question. These attempts at distancing by the Defendant and Ms. Dickson sometimes strained the depths of logic. For example, Ms. Dickson said that she was "[p]retty much always" present with the victim in the bedroom while the victim was jumping back and forth between the beds and the Defendant was sleeping. However, the victim testified to at least one occasion when she was "jumping back and forth" between the two beds, but she was alone in the bedroom with the Defendant.

Tennessee courts have consistently observed that a minor victim's testimony alone regarding sexual contact is sufficient to support a conviction for a sexual offense. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that a child rape victim's testimony was sufficient to support the conviction, despite some inconsistencies in the victim's testimony); *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a

conviction.'" (quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). "The victim's testimony, like the testimony of many child victims, was somewhat hesitant and equivocal." *Wilson v. State*, No. W2018-01588-CCA-R3-PC, 2020 WL 7658417, at *11 (Tenn. Crim. App. Dec. 22, 2020); *see also State v. Hardin*, 691 S.W.2d 578, 581 (Tenn. Crim. App. 1985) (recognizing that it is "usual for young children" to testify in a "somewhat hesitant and uncertain" manner).

The Defendant's arguments relate to the jury's credibility determinations and the weight of the evidence, not its sufficiency. The jury, by its verdict, credited the five-year-old victim's testimony and discredited the twenty-four-year-old Defendant's testimony, and we will not disturb its findings in this regard. *See Bland*, 958 S.W.2d at 659. As previously stated, when a jury renders a guilty verdict that is approved by the trial court, all conflicts are resolved in favor of the State, and the reviewing court accredits the testimony of the State's witnesses. *See Grace*, 493 S.W.2d at 476. The Defendant is not entitled to relief on this basis because the evidence was sufficient to support his conviction for aggravated sexual battery. *See State v. Frazier*, No. W2024-00396-CCA-R3-CD, 2025 WL 1464152, at *12 (Tenn. Crim. App. May 21, 2025) (determining that the victim's testimony was sufficient to support a conviction for aggravated sexual battery despite the defendant's claim "that the victim was not credible, [his] citing inconsistencies in her testimony, her previous recantations of the abuse allegations, and a lack of corroboration supporting her claims"), *perm. app. denied* (Tenn. Oct. 9, 2025); *State v. Hooper*, No. W2021-01069-CCA-R3-CD, 2022 WL 2718863, at *4 (Tenn. Crim. App. July 13, 2022) (holding that the victim's testimony regarding sexual contact when she was a minor was sufficient, standing alone, to support the defendant's convictions for rape of a child and aggravated sexual battery).

## B.    Trial Court's Questioning of the Victim

Next, the Defendant submits that the trial court abused its discretion in independently questioning the victim during the State's direct examination, "result[ing] in prejudicial responses" from the victim and "help[ing]" the State with its case. The Defendant notes that "[t]he State was unable to obtain incriminating testimony from the [victim] . . . until after the [victim] was questioned by" the trial court. The Defendant avers that the trial court's examination, which included leading questions, "went beyond an attempt to clear up obscure points[,]" rather, it rehabilitated the victim who could not remember the information sought. The State responds that "the trial court did not abuse its discretion in briefly questioning the five-year-old victim." According to the State, "[t]he record demonstrates that the trial court did not depart from its role as a neutral arbiter in questioning [the victim] when it sought to expedite the proceedings and clarify a factual

omission." The Defendant responds that "[e]fficiency cannot justify supplying the prosecution's missing proof" or rehabilitating the victim's testimony.

Article VI, section 9 of the Tennessee Constitution prohibits judges from making any comment "with respect to matters of fact." Tenn. Const. art. VI, § 9; *see also State v. Suttles*, 767 S.W.2d 403, 406 (Tenn. 1989). The purpose of this rule is to avoid giving "the jury any impression as to [the judge's] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407; *see also State v. Schiefelbein*, 230 S.W.3d 88, 117 (Tenn. Crim. App. 2007). "It is natural that jurors should be anxious to know the mind of the [c]ourt, and follow it; therefore, a [c]ourt cannot be too cautious in [its] inquiries." *Schiefelbein*, 230 S.W.3d at 117 (quoting *McDonald v. State*, 14 S.W. 487, 488 (Tenn. 1890)).

Tennessee Rule of Evidence 614 specifically permits the interrogation of witnesses by the trial judge, but the questioning must comply with the constitutional mandate of article VI, section 9. *See* Tenn. R. Evid. 614(b) & Advisory Comm'n Cmts. "So long as the inquiry is impartial, trial courts may ask questions to either clarify a point or to supply any omission." *Schiefelbein*, 230 S.W.3d at 118 (first citing *Collins v. State*, 416 S.W.2d 766 (Tenn. 1967); and then citing *Parker v. State*, 178 S.W. 438 (Tenn. 1915)); *see also State v. Hargroves*, 56 S.W. 857, 858 (Tenn. 1900). Questions which tend to expedite the trial are also permitted. *See State v. Hunt*, 665 S.W.2d 751, 755 (Tenn. Crim. App. 1984) (holding that the trial court's questions "which appeared to be intended to speed up the trial and clarify the testimony" were proper).

"[T]rial judges should always use restraint and not interject themselves into a role in a trial which may be perceived as that of an advocate rather than an impartial arbiter." *State v. Riels*, 216 S.W.3d 737, 747 (Tenn. 2007). In order to protect the jury's fact-finding role, the trial judge must be "very careful not to give the jury any impression as to his feelings" or "make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407. "The trial judge may, in the exercise of discretion and with use of restraint, ask questions of witnesses to clear up confusion in the testimony of a witness." *Hardin*, 691 S.W.2d at 581. "Unless the record shows the trial judge has so far questioned a witness in such a manner to clearly show the accused has been prejudiced, a new trial will not be granted." *Id.* (citing *Pique v. State*, 480 S.W.2d 546 (Tenn. Crim. App. 1971))

At the outset, we must address the Defendant's reliance on *State v. Harris* as providing the appropriate framework for evaluating whether a trial court has abused its discretion through its examination of a witness. *See* No. 02C01-9308-CR-00172, 1994 WL

201830 (Tenn. Crim. App. May 25, 1994), *perm. app. denied* (Tenn. Oct. 31, 1994). In *Harris*, this court cited several factors to be considered in analyzing this issue: "first, the nature and role of the witness; second, the length, tone, and manner of the examination; third, the subject matter of the examination; fourth, the context of the examination; and fifth, the expressed or implied motive of the trial judge." *Id.* at *3. For the reasons that follow, we are constrained to agree with the State that *Harris* is not the appropriate yardstick under which to evaluate this issue.

First, *Harris* does not cite any authority as support for application of these five factors. And since its issuance in 1994, the *Harris* case has only been cited twice by this court, and it was done so for reasons other than consideration of the factors set forth therein. *See State v. Sanders*, No. W2014-00989-CCA-R3-CD, 2016 WL 327277, at *16 (Tenn. Crim. App. Jan. 27, 2016) (citing *Harris* for the proposition that questions "which tend to . . . expedite the proceeding" are permitted, then citing to *Hunt*, 665 S.W.2d at 755 in a parenthetical as authority for that proposition); *State v. Shoffner*, No. 03C01-9403-CR-00113, 1995 WL 382628, at *7 (Tenn. Crim. App. June 27, 1995) (citing *Harris* while discussing the appropriate balance between a prosecutor's "vigorous advocacy and the service of justice"). Moreover, post-1994, this court has issued a copious number of opinions on the issue, one published and many more unpublished, which do not take into account the framework espoused in *Harris*. *See Schiefelbein*, 230 S.W.3d at 118-121 (examining, in an aggravated sexual battery and especially aggravated sexual exploitation of a minor case, the propriety of a trial court's questions to the victim, an expert witness, the minor victim's mother, and the State's social worker without making reference to any specific factors like those listed in *Harris*); *e.g.*, *State v. Brush*, No. E2022-00379-CCA-R3-CD, 2023 WL 2911139, at *7 (Tenn. Crim. App. Apr. 12, 2023); *State v. Jones*, No. W2016-02070-CCA-R3-CD, 2018 WL 1040131, at *4-5 (Tenn. Crim. App. Feb. 21, 2018) (both unpublished cases from this court analyzing this issue without reference to particular factors). Unreported cases from this court, like *Harris*, are simply "persuasive authority" except as between the parties to the case. *See* Tenn. R. Sup. Ct. 4(G)(1). And if a conflict arises, published cases clearly take precedent. *See* Tenn. R. Sup. Ct. 4(G)(2).

Finally, while not in the precise context of a trial court's questioning a witness, our supreme court has had occasion to address the appropriateness of alleged improper commentary by a trial court under similar circumstances, and it has never referenced a multi-factor framework in its review of those cases. *See, e.g.*, *State v. Hester*, 324 S.W.3d 1, 89 (Tenn. 2010) (stating that a trial court's comments about certain evidence in the presence of the jury "must be considered in the overall context of the case to determine whether they were prejudicial" (citing *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004))); *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993) ("While we

caution restraint in a trial court's interjections and comments during trial, in the overall context of this case, the trial court's behavior in the cited instances did not so clearly violate the mandate of impartiality as to infringe upon the [d]efendant's right to a fair trial. Furthermore, no prejudice has been shown."). Certainly, intermediate appellate courts have "no authority to overrule or modify" Tennessee Supreme Court opinions. *Bloodworth v. Stuart*, 428 S.W.2d 786, 789 (Tenn. 1968) (citations omitted). Thus, because the explicit factors espoused in *Harris* do not control our analysis here, we will focus on an abuse-of-discretion standard of review in light of the circumstances presented in the overall context of this case.

"A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Black v. Strada*, 721 S.W.3d 223, 226 (Tenn. 2025). Turning to our review of the trial court's questioning of the victim in the instant case, we observe that the Defendant lodged a general objection at trial to the trial court's examination after being prompted by the trial court. In overruling the objection, the trial court explained that "some people can just get better rapport with children," that it had experience with children, and that it "just fe[lt] like trying to get through [the victim's] testimony." When the issue was raised at the motion for new trial hearing, the trial court noted that the victim had appeared nervous and was having difficulty responding to the prosecutor's questions. The trial court then determined that its questioning was not "outside the bounds of appropriate determination," reasoning that the questions posed "were not leading or intended to sway the witness in any manner, but [were] simply an open inquiry as to what happened, who did it, if anybody or anything."

Prior to the trial court's first instance of questioning the five-year-old victim, the victim had indicated that she no longer saw the Defendant, that she knew the reason for this separation, and that the Defendant had "made [her] feel uncomfortable[.]" However, the victim was also unable to recollect specific details in response to many of the prosecutor's questions attempting to have the victim to expound on these matters. The prosecutor was likewise unable to obtain answers from the victim signifying her understanding of the human anatomy, such as "private parts." When the prosecutor asked for "one second[,]" presumably to regroup, the trial court commenced examining the victim about her knowledge of various parts of the body. In response to the trial court's questions, four in total, the victim ultimately agreed that she knew the difference between boys and girls and that she used her private parts to go to the bathroom. The trial court's questioning on the topic was impartial and intended to expeditiously shed light on the victim's knowledge of her anatomy. *See Jones*, 2018 WL 1040131, at *4-5 (concluding, in the

- 19 -

context of plain error review, that the trial court's impartial questions to the minor victim in a prosecution for rape of child, incest, and aggravated sexual battery, which were intended to establish whether the child victim knew the meanings of the terms she was using to describe the sexual assaults, did not constitute an improper comment on the evidence as the judge sought to clarify a point or supply an omission in the proof).

Prior to the second instance of the trial court's questioning, much of the incriminating evidence against the Defendant had already been elicited from the victim in direct response to questions from the prosecutor, despite the victim's continued reluctant responses. The victim had identified the Defendant as the person who used his finger to touch the "[i]nside" of her private parts, which behavior had made her feel weird and uncomfortable. She had indicated that this occurred while they were alone in their shared bedroom, that she subsequently spoke with her mother about this incident, and that she was "[h]appy" she no longer had to spend time with the Defendant.

When the prosecutor again asked for "one second," the trial court asked the victim some more questions. In response to these additional four questions from the trial court, the victim confirmed that she was clothed when this incident took place and that the touching occurred "[i]nside" her clothes with the Defendant's touching of the skin on "the front part where you pee-pee[.]" The victim's responses were consistent across her answers to the prosecutor's and the trial court's questions—she testified on both occasions that the Defendant's touching of her "private parts" happened on the "inside," and she merely clarified through the trial court's examination that she was clothed at the time and that it occurred in the "front" where she "pee[d]." *See Hargroves*, 56 S.W. at 858 (determining no error where the trial court's "examination was intended to make more plain what had already appeared" through the prosecutor's questioning of the defendant because "the trial [court] was not . . . intending to indicate to the jury [any] impression, but, rather, to get the facts more clearly brought out, for the information of the jury and of [the court], and to give the defendant opportunity to give such explanation as he could"). The trial court's questioning on the topic was impartial and intended solely to clarify some of the details or supply any perceived omission in the proof. *See Brush*, 2023 WL 2911139, at *7 (concluding that the trial court's impartial questions seeking to clarify the victim's testimony were proper when the victim claimed that she was unable to recall many of the details surrounding the domestic incident, maintained that she did not wish to testify, and attempted to avoid answering the prosecutor's questions); *State v. Odom*, No. M2022-00756-CCA-R3-CD, 2023 WL 4171011, at *7 (Tenn. Crim. App. June 26, 2023) (concluding, via a plain error analysis, that the trial court's questioning of both the victim and the defendant in an assault and elder abuse case, which was lengthy and included some leading questions, was directed at clarifying the facts of the case).

It is axiomatic that young children who are the victims of sexual abuse are often hesitant to testify. *Hardin*, 691 S.W.2d at 581. Contrary to the Defendant's assertion, the trial court's questioning of the victim did not generate "element-satisfying facts the State had not secured[,]" although the prosecutor ultimately elicited incriminating evidence from the victim of sexual contact after the victim's understanding of "private parts" was established. It likewise did not serve to rehabilitate the five-year-old victim's testimony, as her credibility had not been attacked or undermined through impeachment at that point. This court has recognized that, "[i]f 'the record establishes that the court's questions were designed to clarify the testimony being offered,' it does not matter that the witness' answers 'bolstered the State's position.'" *Odom*, 2023 WL 4171011, at *7 (quoting *Agostinho v. State*, No. M2014-01928-CCA-R3-PC, 2015 WL 5451483, at *6 (Tenn. Crim. App. Sep. 16, 2015)). We cannot say that the trial court in the present case abused its discretion through the questions it posed to the victim: the questioning was fairly brief, the questions were impartial, and the trial court did not state or imply a personal opinion on the victim's credibility before the jury. *See Suttles*, 767 S.W.2d at 407; *Hardin*, 691 S.W.2d at 581.

Additionally, in its preliminary instructions to the jury, the trial court informed the jury that it might "ask a question or two of a witness" during the course of the trial. The trial court emphasized that, if it did so, such was not to be viewed as expressing any opinion on the facts or on the witness' credibility. In its closing instructions, the trial court also pointed out to the jurors that they were the exclusive judges of the facts, were free to decide which witnesses to believe, and were to weigh the evidence as they saw fit. A jury is presumed to follow the trial court's instructions. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002); *see also Odom*, 2023 WL 4171011, at *7 (noting the trial court's instruction to the jury that, if it asked questions of a witness, such did not "indicate . . . any opinion about the facts in the case or . . . any opinion with respect to that witness' credibility[,]" and that juries were presumed to follow instructions, and then determining that the trial court's questioning did not have any notable impact on the defendant's credibility or effect on the jury); *State v. Myrick*, No. W2008-02190-CCA-R3-CD, 2010 WL 2695542, at *11 (Tenn. Crim. App. July 7, 2010) (holding the trial court did not improperly comment on the evidence when, during a curative instruction, it noted that certain statements were admissible, but that it was the jury's duty to determine the credibility and weight of the evidence).

We think it also of importance to note that the Defendant was acquitted of the greater charge of aggravated rape of child and convicted of the lesser included offense of aggravated sexual battery, which only requires an intentional touching of the victim's intimate parts, regardless of whether the victim is clothed. *See* Tenn. Code Ann. §§ 39-13-504(a)(4) (requiring "unlawful sexual contact" to support a conviction for aggravated

sexual battery), -501(6) (defining "sexual contact"). The Defendant has also failed to establish that he was prejudiced. *See Hardin*, 691 S.W.2d at 581. Accordingly, he is not entitled to relief on this issue.

### III. CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgment of the trial court.


     s/Kyle A. Hixson
KYLE A. HIXSON, JUDGE